JS 44 (Rev. 3/99)   ~~ORIGINAL~~   **CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SUNSET MANAGEMENT, LLC, derivatively on behalf of TRANSCONTINENTAL REALTY INVESTORS, INC. | AMERICAN REALTY INVESTORS, INC., BASIC CAPITAL MANAGEMENT, INC., PRIME INCOME ASSET MANAGEMENT, INC., PRIME INCOME, et al. |

**(b)** County of Residence of First Listed Plaintiff  St. Croix, US Virgin Isl.
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  DALLAS COUNTY
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address and Telephone Number)
Deborah Deitsch-Perez, State Bar No. 24036072
Lackey Hershman, L.L.P.
3102 Oak Lawn Ave., Suite 777
Phone: (214) 560-2201 / Fax: (214) 560-2203

Attorneys (If Known)

RECEIVED
OCT - 5 2004
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

3 04 C V 2162 - B

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) |
|---|---|

III. (For Diversity Cases Only)

| | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R. R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to vacate Sentence HABEAS CORPUS: | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | ☐ 871 IRS –Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| ☐ 290 All Other Real Property | | ☐ 555 Prison Condition | | | |

**V. ORIGIN**   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity)

Diversity - 28 U.S.C. § 1332(a).

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ In excess of $60,000,000 | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ YES   ☐ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (see instructions):   JUDGE ___   DOCKET NUMBER ___

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| October 5, 2004 | Deborah Deitsch-Perez |

**FOR OFFICE USE ONLY**

RECEIPT # ___   AMOUNT ___   APPLYING IFP ___   JUDGE ___   MAG JUDGE ___

American LegalNet, Inc   www.USCourtForms.com

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT - 5

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

| | |
|---|---|
| SUNSET MANAGEMENT, LLC, derivatively on behalf of TRANSCONTINENTAL REALTY INVESTORS, INC., | § § § § |
| Plaintiff, | § § |
| vs. | § § |
| AMERICAN REALTY INVESTORS, INC., BASIC CAPITAL MANAGEMENT, INC., PRIME INCOME ASSET MANAGEMENT, INC., PRIME INCOME ASSET MANAGEMENT, LLC, INCOME OPPORTUNITY REALTY INVESTORS, TED P. STOKELY, UNITED HOUSING FOUNDATION, INC., HENRY BUTLER, EARL CECIL, MARTIN L. WHITE, SHARON HUNT, TED MUNSELLE, MARK W. BRANIGAN, LOUIS J. CORNA, MICKEY N. PHILLIPS, RYAN T. PHILLIPS, DAN S. ALLRED, GENE E. PHILLIPS, RONALD E. KIMBROUGH, J.C. LOWENBERG, III, REGIS REALTY, INC., and TRANSCONTINENTAL REALTY INVESTORS, INC., | § § § § § § § § § § § § § § § § § § § § § |
| Defendants. | § |

3 04CV2162- B

CIVIL ACTION NO. _____

## PLAINTIFF'S ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

Plaintiff Sunset Management, LLC ("Sunset"), on personal knowledge as to matters in which it was directly involved and on information and belief as to all others, files this Original Complaint and Request for Injunctive Relief against American Realty Investors, Inc. ("ARI"), Basic Capital Management, Inc. ("BCM"), PRIME Income Asset Management, Inc. ("PAM"), PRIME Income Asset Management, LLC ("PRIME"), Income Opportunity Realty Investors

("IORI"), Regis Realty, Inc. ("REGIS"), Ted P. Stokely, United Housing Foundation, Inc. ("UHF"), Henry Butler, Earl Cecil, Martin L. White, Sharon Hunt, Ted Munselle, Mark W. Branigan, Louis J. Corna, Mickey N. Phillips, Ryan T. Phillips, Dan S. Allred, Gene E. Phillips, Ronald E. Kimbrough, J.C. Lowenberg, III, and Transcontinental Realty Investors, Inc. ("TCI") (collectively, "Defendants") derivatively on behalf of TCI, as follows:

## I.

## PRELIMINARY STATEMENT

TCI is being looted by Defendants. Since TCI emerged from the supervision of a federal court action finally settled in February, 2002, Defendants have and continue to engage in a disproportionate number of related-party transactions that have stripped TCI of its cash while increasing TCI's debt to extraordinary levels. Defendants have breached their fiduciary duties by stripping more than $100 million out of TCI in the last two years. Sunset brings this suit to try to preserve what value, if any, is left in TCI for the benefit of the corporation and its public shareholders.

## II.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter under 28 U.S.C. § 1332 because there is complete diversity; Sunset Management, LLC's sole member is a citizen residing in the United States Virgin Islands and the defendants are all citizens of various states not including the Virgin Islands.  In addition, jurisdiction is proper in this Court because: (1) TCI's principal place of business is in Dallas County, Texas; (2) TCI purposefully availed itself of the privilege of conducting business activities in Texas; (3) Defendants have continuous and systematic business contacts with Texas; (4) the amount in controversy exceeds the minimum jurisdictional threshold

of this Court; and (5) Plaintiff was a record and beneficial owner of TCI shares at the time of the transactions of which Plaintiff complains, or the TCI shares otherwise devolved upon Plaintiff by operation of law from a person that was the owner at that time.

2.      Venue is proper pursuant to 28 U.S.C. § 1391 and § 1401 because a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of the property that is the subject of the suit is situated in this District.

### III.

### DEMAND ON BOARD WOULD BE FUTILE

3.      A quorum of disinterested directors or shareholders could not be assembled to appraise the merits of Plaintiff's claims, thereby making any demand by Plaintiff a futile and ritualistic act.  All of TCI's directors have engaged in, approved of, or failed to stop the wrongful conduct alleged herein.  All of TCI's directors, as a result of their actions, have been named as parties to the suit.

4.      Among the directors of TCI, only three, Martin White ("White"), Sharon Hunt ("Hunt") and Ted Munselle ("Munselle") are denominated "independent" in TCI's public filings. However, in the context of this action, White, Hunt and Munselle are anything but disinterested.

5.      According to the proxy statement for the 2004 Annual TCI Stockholder Meeting, both Hunt and Munselle are directors of Defendant ARI and White is a director of Defendant IORI and therefore each receives fees from TCI, and at least one related party defendant which includes:  $30,000 per annum for a TCI Board assignment, $45,000 per annum for an ARI Board assignment, $15,000 per annum for an IORI Board assignment, reimbursement of expenses and $1,000 per day for any "special services" rendered.  Hunt, Munselle and White, members of ARI's Audit Committee are additionally compensated $300 per Audit Committee meeting

attended. "Independent" directors also receive stock options. As described below, IORI and ARI are the beneficiaries of numerous of the "related-party" transactions at issue herein. Thus, making demand on directors White, Hunt and Munselle, who benefited from these related-party transactions as directors of IORI, and/or ARI would be futile.

6.      In addition, publicly available reports indicate that defendant Gene Phillips dominates the TCI Board, preventing any members from exercising independence. Indeed, TCI's former CFO Defendant Kimbrough has testified under oath that Board members never stood up to Phillips; they never said "No, Gene, we're not doing that."

## IV.

## THE PARTIES

7.      Plaintiff Sunset Management, LLC ("Sunset") is a limited liability company organized and existing pursuant to the laws of the State of Nevada and having its principal place of business at #17 Strand Building, Frederiksted, VI 00841. Sunset was and is record owner of 10 shares of TCI common stock from July 22, 2002, to the present. In addition, Sunset, pursuant to pledge agreements dated September 17, 2001, and irrevocable proxies dated June 7, 2002, became the beneficial owner (for purposes of a derivative suit) of more than 3,673,115 shares of TCI stock, constituting more than 45.5% of TCI's outstanding common stock and is still the beneficial owner of that stock. Sunset's sole member is John Baldwin, a resident of the United States Virgin Islands.

8.      TCI is a publicly traded Nevada corporation, with its principal place of business at 1800 Valley View Lane, Suite 300, Dallas, Texas. TCI may be served via its registered agent in the State of Texas, Louis J. Corna, at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

9.      ARI is a Texas corporation with its principal place of business at 1401 West

Pioneer Parkway, Suite 114, Arlington, Texas, 76013. As of March 19, 2003, ARI owned approximately 64.5% of IORI. The directors and officers of TCI, BCM, and PRIME, also serve as the officers of ARI. ARI may be served via its registered agent in the State of Texas, G. C. Mitchell, at 1401 West Pioneer Parkway, Suite 114, Arlington, Texas 76013.

10.     BCM is a Nevada corporation, with its principal place of business at 1800 Valley View Lane, Suite 300, Dallas, Texas. BCM provided "advisory" services to TCI from March 28, 1989, to June 30, 2003, when PAM replaced BCM. The directors and officers of BCM are also directors and officers of TCI, ARI, and PRIME. BCM may be served via its registered agent in the State of Texas, Louis J. Corna, at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

11.     PAM, f/k/a PRIME Asset Management, Inc., is a Nevada corporation, with its principal place of business at 1800 Valley View Lane, Suite 300, Dallas, Texas. PAM replaced BCM as the "advisor" to TCI under the same terms as BCM's advisory agreement with TCI. PAM may be served via its registered agent in the State of Texas, Louis J. Corna, at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

12.     PRIME is a Nevada limited liability corporation, with its principal place of business at 1800 Valley View Lane, Suite 300, Dallas, Texas. PRIME replaced PAM on October 1, 2003, as the "advisor" to TCI, and is owned 100% by PAM. PRIME, like its predecessors PAM and BCM had done, also serves as advisor to ARI. As of March 19, 2003, PRIME also owned approximately 14.5% of TCI. The directors of TCI are also directors of ARI. The officers of PRIME also serve as the officers of TCI, ARI, and BCM. PRIME may be served via its registered agent in the State of Texas, Louis J. Corna, at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

13.     IORI, d/b/a IORI, Inc., is a Nevada corporation, with its principal place of

business at 1800 Valley View Lane, Suite 300, Dallas, Texas.  As of March 19, 2003, TCI owned approximately 24% of IORI.  IORI may be served via its registered agent in the State of Texas, Louis J. Corna, at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

14.     REGIS is a Nevada corporation, with its principal place of business at 555 Republic Dr., Suite 490, Plano, Texas 75074.  REGIS may be served via its registered agent in the State of Texas, Ron F. Akin, at 1800 Valley View Lane, Suite 140, Dallas, Texas 75234.

15.     UHF is identified as a "Texas Non-profit 501(c)3 Corporation" in TCI's 2003 10-K.  However, the Texas Secretary of State has no listing of UHF or an agent identified for service of process for UHF.  Accordingly, UHF may be served via the Texas Secretary of State, 1019 Brazos Street, Austin, Texas, 78701.

16.     Ted P. Stokely ("Stokely") is a director and Chairman of the Board of TCI, IORI, and ARI.  Stokely may be served at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

17.     Henry Butler ("Butler") is director of TCI and ARI, and was a director of IORI from December 2001 to July 2003.  Butler may be served at 1800 Valley View Lance, Suite 300, Dallas, Texas 75234.

18.     Earl Cecil ("Cecil") has been a director of TCI and IORI since March 2002, and a director of ARI from November 2001 until February 29, 2004.  Cecil may be served at 1800 Valley View Lance, Suite 300, Dallas, Texas 75234.

19.     Martin L. White ("White") is a director of TCI and was a director of IORI from January 1995 to March 2004.  White may be served at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

20.     Sharon Hunt ("Hunt") has been a director of TCI and ARI since February 2004. Hunt may be served at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

21.     Ted R. Munselle ("Munselle") has been a director of TCI and ARI since February 14, 2004.  Munselle may be served at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

22.     Mark W. Branigan ("Branigan") is an Executive Vice President of TCI, PAM, and PRIME.  Branigan may be served at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

23.     Louis J. Corna ("Corna") is Executive Vice President, General Counsel, and Secretary of TCI.  Corna is also an Executive Vice President of BCM, PAM, PRIME, IORI, and ARI.  Corna may be served at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

24.     Ronald E. Kimbrough ("Kimbrough") was Acting Principal Executive Officer, Executive Vice President, and Chief Financial Officer of TCI, BCM, PAM, PRIME, IORI, and ARI from at least January 2002 to June 30, 2004.  Kimbrough may be served at 14181 Noel Road, Dallas, Texas 75254-4386.

25.     J.C. Lowenberg, III ("Lowenberg") is and has been Executive Vice President, CFO of TCI, ARI, BCLM, and PRIME since July 1, 2004.  Lowenberg may be served at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

26.     TCI is managed by the managers and officers of PRIME which, according to TCI's public filings, is charged with deciding which of various related parties should have the benefit of each of the dozens of related-party transactions into which TCI is placed.

27.     Defendants Branigan, Corna and Lowenberg are managers or officers of PRIME.

28.     In addition, Mickey M. Phillips ("M. Phillips") is a manager of PRIME and has been (or has been a manager/director of prior advisors to TCI) since at least 2001. M. Phillips can be served at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

29.     Ryan T. Phillips ("R. Phillips") is a manager of PRIME (or has been a



manager/director of prior advisors to TCI) since at least 2001. R. Phillips can be served at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

30.    Dan S. Allred ("Allred") is a Senior Vice President of PRIME and has been since 2001. Allred can be served at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

31.    Gene E. Phillips ("Gene Phillips") is the untitled but controlling advisor to PRIME and the controlling manager of TCI. Gene Phillips can be served at 1800 Valley View Lane, Suite 300, Dallas, Texas 75234.

<div align="center">

**V.**

**APPLICABLE FACTS**

</div>

**A.    Sunset Is A Record And Beneficial Owner Of TCI shares.**

32.    Sunset is and was the record owner of 10 shares (the "Record Shares") of common TCI stock, which it acquired on July 22, 2002. In addition, Sunset, pursuant to pledge agreements dated September 17, 2001, and irrevocable proxies dated June 7, 2002, became the beneficial owner (for purposes of a derivative suit) of more than 3,673,115 shares of TCI stock (the "Beneficial Shares"), constituting more than 45.5% of TCI's outstanding common stock and is still the beneficial owner of that stock: 2,129,701 TCI shares were pledged to Sunset by EQK Holdings, Inc.; 920,507 TCI shares pledged to Sunset by BCM; and 622,907 TCI shares pledged to Sunset by American Realty Trust, Inc.

33.    Approximately 20% of TCI's shares are held by public shareholders according to TCI's most recent public filings.

**B.    Opportunity for Abuse.**

34.    TCI is part of a complex web of companies related to and controlled by Gene Phillips. An organizational chart, based on the most recent public filings, is attached as Exhibit 1

and incorporated herein.

35.    Between February 2002 and July 1, 2003, TCI was managed by BCM, indirectly owned by a trust for the Phillips children. Between July 1, 2003 and October 1, 2003, PAM and then PRIME replaced BCM as TCI's manager.

36.    PRIME is indirectly owned by a trust for the Phillips children and by an entity owned 100% by Phillips.

37.    Defendant Gene Phillips makes the significant decisions for PRIME and for TCI. The Board of Directors does not independently assess, from the standpoint of TCI's shareholders, the related-party transactions into which TCI is placed. No outside fairness opinions of such transactions are obtained.

38.    There are dozens of Phillips-related entities that BCM caused, and PRIME now causes, to buy and sell properties and loans to and from each other, including the other two public entities. BCM received, and now PRIME receives, fees based upon the number and size of the transactions; thus, an incentive exists for churning the properties of TCI and the other entities. Because three entities (TCI, ARI and IORI) are managed by the same company, by definition, a transaction that benefits one entity by transferring value from a related party hurts that related party. TCI's agreement with PRIME is annexed to its 8-K filed October 14, 2003 and is annexed hereto as Exhibit 2 and incorporated herein.

39.    Sunset does have an individualized motivation for bringing this action, in addition to its motivation common to all shareholders. In September 2001, Sunset loaned money to various Phillips-related entities. Shares of TCI stock were pledged as collateral. When the loan was made, TCI was subject to the supervision inherent in the "*Olive* litigation," a derivative suit in federal court in California that lasted more than twelve years and was finally settled in

February 2002.

40.    More than $20 million is due and unpaid on the loan made by Sunset, which is subject to litigation in the bankruptcy court administering the bankruptcy of one of the borrowers.  Sunset seeks in this action to protect the value of its collateral.  This motivation aligns Sunset's interest with that of the public shareholders of TCI.

## C.    Defendants Are Looting TCI.

41.    Comparing the two years before supervision ended (2000-2001) and the two years after (2002-2003) demonstrates that TCI is being looted at an alarming pace.

42.    According to TCI's public filings, in the two years before TCI's court supervision ended (2000-2001), TCI's net income was $49,399,000.00, fees paid by TCI to related parties were $40,835,000.00, the number of related-party transactions was five, and the cash transferred from TCI to affiliates was only about $181,000.  From February 2002 to February 2004, however, the two-year period after the *Olive* litigation conclusion, TCI's net income dropped to $3,413,000.00, the fees paid by TCI to related parties were $40,319,000.00, the number of related-party transactions skyrocketed to 56, and the cash drained from TCI to affiliates rose to a whopping $61,342,000.00, according to TCI's public filings.

43.    That management fees could remain constant when TCI's income dropped by 90% is a red flag indicating that the management fees were manipulated to obtain certain amounts required by the related parties receiving them rather than by performance.

44.    In addition, the $61 million cash stripped out of TCI to related parties (not counting advisory fees) resulted from related party transactions of no obvious utility to TCI. While the net outflow of $61 million is disclosed in the 2003 TCI 10-K, it is extremely difficult (and sometimes impossible) to link the summary cash flow information to the dozens of related-

party transactions identified in the 10-Ks. The public filings disclose over $350 million in transferred values, the net result of which was $100 million leaving TCI.

45.    Even without discovery, examining a selection of the related-party transactions disclosed demonstrates the abuse of TCI taking place. There are many more related-party transactions listed in TCI's public filings than the sample set forth below; collectively they contribute to the removal of over $100 million in cash from TCI and thus should all be the subject of examination in this suit.

46.    For example, in 2002, TCI made $46.2 million in advances to affiliates and received notes receivable and encumbered property in exchange (TCI 2002 10-K at 24). Later, in 2002, ARI, keeping cash received from TCI, "sold" TCI dozens of properties to reduce note receivables from ARI and BCM to TCI in the amounts of $5 million and $41.2 million respectively (*Id.* at 54). Of course, each transaction entitled BCM to an advisory fee, apparently from both TCI and ARI, the public companies.

47.    TCI also simply bought property from affiliates, such as its $8 million purchase of "Bridgeview" and its $50 million purchase of the Centura building, (TCI 2003 10-K at 86) again causing advisory fees to be earned and moving cash out of TCI.

48.    TCI "sold" various properties to UHF (a not-for-profit entity controlled by TCI Chairman Ted Stokely) but received no cash for the properties and kept control of the properties such that if the property values increased, UHF could close the transaction and reap the benefits, but if the values declined, the properties would remain with and be carried by TCI; six properties with listed values of $1.5 million, $19 million, $13.4 million, $18 million, $29.4 million and $16.1 million were treated in this fashion (TCI 2003 10-K at 23).

49.    TCI purchased ARI subsidiaries "Woodsong," "Foxwood," "Garden Confederate"

and "One Hickory" for $10 million (TCI 2002 10-K at 17, 49 and 54). However, when Woodsong was sold in July 2002, ARI received $2.8 million of the proceeds and TCI received a $2.8 increase in its note receivables from ARI (*Id.*). One Hickory was then sold to IORI in 2003 for $12.2 million with TCI receiving a promissory note from IORI for $12 million at 5.49% interest (TCI 2003 10-K at 15).

50.     There are at least two related-party transactions with PRIME identified in the TCI 2003 10-K. In each, TCI sells property (a shopping center and raw land in California) to a third party, but PRIME receives the cash proceeds of $1.6 and $2.6 million respectively (TCI 2003 10-K at 44 (ARI may have received part of the $1.6 million)). Likewise, there are three transactions in 2003 involving unnamed related parties (i.e. identified only as "affiliates") in which TCI sells properties referenced to as "Solco," "Palm Desert" and "Oak Tree" for $2 million, $2.6 million and $1.6 million respectively, with the cash going to an unnamed affiliate, and TCI receiving an increase in its notes receivables (TCI 2003 10-K at 10).

51.     In March 2003, TCI sold a note receivable for $2.6 million to a third party, but the proceeds were received by BCM, increasing TCI's receivable from BCM (TCI 2003 10-K at 44). In May 2003, TCI sold a piece of raw land in Texas. The proceeds were again received by BCM and increased TCI's receivable from BCM by $2 million (*Id.*). In July 2003, TCI paid $1.7 million to BCM for the prior year's legal fees incurred by Gene Phillips in defense of criminal charges brought in the Southern District of New York. No explanation why TCI should bear those charges is given (*Id.*). Finally, in 2004, TCI guaranteed a $10 million line of credit for its parent ARI. TCI pledged assets in the form of securities and partnership interests in construction property, as additional collateral (TCI 2003 10-K at 55). No reason for TCI providing the guaranty is given.

52.     Finally, even though the advisory agreement pursuant to which BCM (and then PRIME) received and receives advisory fees provides for fees to be paid specifically for managing TCI based upon TCI's gross asset value (in addition to other fees for sales, purchases, brokerages, financings, refinancings, etc.), and Regis Realty, Inc. (another Phillips-related company) receives 6% of TCI's construction costs as management fees (reported as $4.7 million in the TCI 2002 10-K at 57), in January 2003, TCI's Board of Directors approved the post hoc payment to BCM of an additional management fee of 6% on all TCI construction costs "in process" as of December 31, 2002. This resulted in fees of $4.6 million which were applied to reduce the affiliate receivable balance from BCM to TCI. (TCI 2002 10-K at 54). The public filings fail to disclose whether the TCI projects also have third-party general contractors who themselves receive construction management fees.

53.     The disparity in the "before" and "after" performance is even more alarming when TCI is compared to five similar public companies (such as Mission West Properties, Parkway Properties, Inc., Glenboroughs Realty Trust, Avatar Holdings, Inc. and Kramart Realty Trust) over the same period of time. According to public filings, comparable companies have virtually no related-party fees or loans, and virtually no related-party transactions.

54.     Tellingly, unlike TCI, whose income plummeted more than 90% in the two years following cessation of court supervision related to the *Olive* litigation, competitors' revenue and income stayed consistent or improved.

55.     As a result of the related-party transactions, TCI's stock performed significantly worse in every category customarily used to compare the stock within the industry, including market cap, percent float, debt for equity price book, average shares traded per day, profit margin, operating margin, return on acquisitions, and return on earnings.

56.    The reason for the drastic and sudden decline is clear.  In the two years following supervision (2002-2003), TCI has paid fees and/or made loans to related entities in excess of $100,000,000, while the five comparable public companies reflect only $13 million in such fees and/or loans combined.

57.    According to the most recent public filings, shareholder equity as reported in the most recent 10-Q has dropped from that stated for December 2003 year end, liabilities owed to and from related parties have increased, and TCI's net loss (and the rate at which it is losing money) increased markedly for the most recent three-month period reported as compared to even the most recent six-month period reported (TCI August 10-Q).

58.    Finally, TCI's Form 8-K filing on August 24, 2004 acknowledges that "[i]n 2004 Transcontinental Realty Investors, Inc. ("TCI") sold a significant amount [approximately 10%] of its assets. . ."  There were again numerous related-party transactions.  These events, in light of TCI's further admission in the 10-Q that its cash flow in 2004 "will not be sufficient to discharge all of TCI's debt obligations as they mature," and that TCI intends to continue to "sell income producing real estate, refinance real estate and incur additional borrowings against real estate to meet cash flow" continue to give Plaintiff concerns about TCI's future.

59.    These concerns are exacerbated by the fact that Gene Phillips is currently involved in a criminal investigation involving alleged bribery of an Oklahoma insurance commissioner.  TCI's share prices dropped precipitously the last time Mr. Phillips was indicted.  Even if Mr. Phillips avoids criminal prosecution in the Oklahoma matter, TCI is nonetheless precariously perched.  For example, if the real estate market softens and interest rates rise, a company as heavily leveraged as TCI will be at enormous risk.  For these reasons, TCI should be enjoined from entering into related-party transactions in which it does not receive fair value that

is either cash or sufficiently secure as to be collectable. It is time for defendants to stop using TCI as their personal piggy bank, stripping out the cash and hard assets, and replacing them with paper.

## VI.

## CLAIMS

**A.**    **Count One: Breach of Fiduciary Duty against BCM, PAM, and PRIME.**

60.    Plaintiff realleges and incorporates the preceding paragraphs.

61.    BCM, PRIME and PAM, the "advisors" of TCI, owe Plaintiff fiduciary duties, including the highest duties of good faith and fair dealing, due care and loyalty.

62.    BCM, PRIME and PAM's participation in the related-party transactions described herein, which resulted in TCI's loss of cash and precarious economic health, constituted a breach of PAM, PRIME, and BCM's duties of good faith and fair dealing, due care, and loyalty.

63.    BCM, PRIME and PAM's "advice" to and "management" of TCI evidences their conflict of interest, self-dealing and bad faith by receiving significant management and advisory fees for, in effect, removing assets from TCI.

64.    Plaintiff has suffered economic damages as a proximate result of BCM, PRIME, and PAM's breaches of their fiduciary duties to Plaintiff.

65.    Accordingly, Plaintiff is entitled to monetary damages of at least $60 million, but in any event, an amount sufficient to fully compensate it for the harm it has sustained.

66.    The acts and conduct of Defendants BCM, PRIME and PAM were intentional, willful, wanton, and malicious, and were without justification or excuse. Accordingly, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined by the trier of fact.

---

**B.**   **Count Two:   Breach of Implied Covenant of Good Faith and Fair Dealing Against BCM, PAM and PRIME.**

67.   Plaintiff realleges and incorporates the preceding paragraphs.

68.   BCM, PRIME and PAM, the "advisors" of TCI, owe Plaintiff a duty of good faith and fair dealing, inherent in the contractual relationship with TCI.

69.   BCM, PRIME and PAM breached the implied covenant of good faith and fair dealing owed to TCI by charging excessive fees and providing management and advice to TCI that was not in the best interest of, or for the benefit of TCI, but instead enriched BCM, PRIME and PAM through self dealing and numerous related-party transactions.

70.   Plaintiff has suffered economic damages as a proximate result of BCM, PRIME and PAM's breaches of their duty of good faith and fair dealing.

71.   Accordingly, Plaintiff is entitled to monetary damages of at least $60 million, but in any event, an amount sufficient to fully compensate it for the harm it has sustained.

72.   The acts and conduct of Defendants BCM, PRIME and PAM were intentional, willful, wanton, and malicious, and were without justification or excuse.   Accordingly, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined by the trier of fact.

**C.**   **Count Three:   Breach of Fiduciary Duty against Butler, Cecil, White, Hunt, Munselle, Branigan, Corna, Kimbrough and Lowenberg.**

73.   Plaintiff realleges and incorporates the preceding paragraphs.

74.   Defendants Stokley, Butler, Cecil, White, Hunt, Munselle, Branigan, Corna, Kimbrough and Lowenberg, as officers or directors of TCI, owed Plaintiff fiduciary duties, including the duties of good faith and fair dealing, due care, and loyalty.

---

75.     However, Defendants Stokley, Butler, Cecil, White, Hunt, Munselle, Branigan, Corna, Kimbrough and Lowenberg, breached the duties of good faith and fair dealing and the duty of loyalty by participating in and approving the related-party transactions described herein which were not fair to TCI at the time they were authorized or approved.

76.     Defendants Stokley, Butler, Cecil, White, Hunt, Munselle, Branigan, Corna, Kimbrough and Lowenberg failed to consider the short or long term interests of TCI when approving these related-party transactions and unreasonably relied on the advice of the interested and related parties BCM, PRIME and PAM.

77.     Defendants Stokley, Butler, Cecil, White, Hunt, Munselle, Branigan, Corna, Kimbrough and Lowenberg's wrongful conduct by participating in and approving of the related-party transactions described herein evidences their conflict of interest, self-dealing and bad faith.

78.     These related-party transactions were not in the best interest of or for the benefit of TCI. Indeed, as a result of these transactions, the value of TCI and its stock has diminished.

79.     As a direct and proximate result of Defendants Stokley, Butler, Cecil, White, Hunt, Munselle, Branigan, Corna, Kimbrough and Lowenberg's conduct, Plaintiff has been injured.

80.     Accordingly, Plaintiff is entitled to monetary damages of at least $60 million, but in any event, an amount sufficient to fully compensate it for the harm it has sustained.

81.     The acts and conduct of Defendants Stokley, Butler, Cecil, White, Hunt, Munselle, Branigan, Corna, Kimbrough and Lowenberg's were intentional, willful, wanton, and malicious, and were without justification or excuse. Accordingly, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined by the trier of fact.

---

**D.    Count Four:    Breach of Fiduciary Duty against Stokley, Butler, Cecil, White, Branigan, Corna, and Kimbrough.**

82.    Plaintiff realleges and incorporates the preceding paragraphs.

83.    Defendants Stokley, Butler, Cecil, White, Branigan, Corna, and Kimbrough, as officers or directors of TCI, owed Plaintiff fiduciary duties, including the highest duties of good faith, due care, fair dealing, and loyalty.

84.    However, Defendants Stokley, Butler, Cecil, White, Branigan, Corna, and Kimbrough, breached the duty of due care and the duty of loyalty by participating in, approving of or failing to prevent the $1.7 million payment to BCM and/or Gene Phillips for the criminal legal fees incurred by Gene Phillips, which was not in the best interest of, or for the benefit of TCI.

85.    Defendants Stokley, Butler, Cecil, White, Branigan, Corna, and Kimbrough failed to consider the short or long term interests of TCI when participating in, approving of or failing to prevent the $1.7 million payment of legal fees.

86.    Defendants Stokley, Butler, Cecil, White, Branigan, Corna, and Kimbrough's wrongful conduct by participating in, approving of, or failing to prevent the $1.7 payment in legal fees evidences their conflict of interest, self-dealing, bad faith and inability to prioritize the best interest of TCI over the interests of related parties.

87.    Payment of the legal fees were not in the best interest of or for the benefit of TCI. Indeed, as a result of these transactions, the value of TCI and its stock has diminished.

88.    As a direct and proximate result of Defendants Stokley, Butler, Cecil, White, Branigan, Corna, and Kimbrough's conduct, Plaintiff has been injured.

89.    Accordingly, Plaintiff is entitled to monetary damages of at least $60 million, but in any event, an amount sufficient to fully compensate it for the harm it has sustained.

90.     The acts and conduct of Defendants Stokley, Butler, Cecil, White, Branigan, Corna, and Kimbrough were intentional, willful, wanton, and malicious, and were without justification or excuse.   Accordingly, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined by the trier of fact.

E.     **Count Five:   Conspiracy to Commit Breach of Fiduciary Duty (against all Defendants).**

91.     Plaintiff realleges and incorporates the preceding paragraphs.

92.     Defendants conspired, by concerted action, to enter into a common plan, design, or scheme to facilitate the devaluation of TCI, which damaged Plaintiff.   Defendants engaged in numerous related-party transactions, described herein, that were conducted for the benefit of others besides TCI.   This conduct breached fiduciary including the highest duties of good faith, due care, fair dealing, and loyalty owed to TCI.

93.     Plaintiff has suffered economic damages as a proximate result of Defendants' conspiracy.

94.     Accordingly, Plaintiff is entitled to monetary damages of at least $60 million, but in any event, an amount sufficient to fully compensate it for the harm it has sustained.

95.     The acts and conduct of Defendants were intentional, willful, wanton, and malicious, and were without justification or excuse.   Accordingly, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined by the trier of fact.

F.     **Count Six:   Aiding and Abetting   Breach of Fiduciary Duty (against all Defendants).**

96.     Plaintiff realleges and incorporates the allegations set forth above.

97.     Defendants are each liable for all damages caused by the schemes and related party transactions described herein because Defendants knew and were aware that their

---

individual conduct and the conduct of the other Defendants described above constituted breaches
of fiduciary duties, and Defendants knowingly gave substantial assistance and/or encouragement
to the others to continue with the scheme.

98.     Plaintiff has suffered economic damages as a proximate result of Defendants'
conspiracy.

99.     Accordingly, Plaintiff is entitled to monetary damages of at least $60 million, but
in any event, an amount sufficient to fully compensate it for the harm it has sustained.

100.    The acts and conduct of Defendants were intentional, willful, wanton, and
malicious, and were without justification or excuse.  Accordingly, Plaintiff is entitled to recover
punitive damages from Defendants in an amount to be determined by the trier of fact.

**G.     Count Seven: Unjust Enrichment Against BCM and Gene Phillips.**

101.    Plaintiff realleges and incorporates the allegations set forth above.

102.    It would be inequitable for BCM and/or Gene Phillips to retain the $1.7 million in
legal fees paid by TCI.

103.    BCM and/or Gene Phillips did not earn this payment of legal fees as they were
already being handsomely compensated by management and advisory fees.

104.    Plaintiff has suffered economic damages as a proximate result of the payment of
Gene Phillips' criminal legal fees.

105.    Plaintiff has suffered economic damages and is entitled to monetary damages in
an amount sufficient to fully compensate it for the harm it has sustained, including return of the
$1.7 million.

106.    The acts and conduct of Defendants was intentional, willful, wanton, and malicious, and were without justification or excuse. Accordingly, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined by the trier of fact.

**H.    Count Eight: Unjust Enrichment Against BCM, PRIME and PAM.**

107.    Plaintiff realleges and incorporates the allegations set forth above.

108.    It would be inequitable for BCM, PRIME and PAM to retain the excessive fees they were paid.

109.    The Defendants did not earn the excessive fees they were paid because the "advice" provided resulted in loss of assets and devaluation of TCI while funneling huge amounts of money to these entities.

110.    Accordingly, Plaintiff is entitled to monetary damages of at least $60 million, but in any event, an amount sufficient to fully compensate it for the harm it has sustained.

111.    The acts and conduct of Defendants was intentional, willful, wanton, and malicious, and were without justification or excuse. Accordingly, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined by the trier of fact.

**I.    Count Nine: Unjust Enrichment Against UHF.**

112.    Plaintiff realleges and incorporates the allegations set forth above.

113.    It would be inequitable for UHF to keep control of the properties "sold" to it by TCI since TCI received no or insufficient consideration for the properties although the combined value of the properties (according to public filings) is $97 million.

114.    Accordingly, Plaintiff is entitled to monetary damages in an amount sufficient to fully compensate it for the harm it has sustained.

115.   The acts and conduct of Defendant was intentional, willful, wanton, and malicious, and were without justification or excuse. Accordingly, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined by the trier of fact.

**J.      Count Ten: Breach of Fiduciary Duty Against Gene Phillips**

116.   Plaintiff realleges and incorporates the allegations set forth above.

117.   Gene Phillips, advisor of TCI and the TCI board of directors, owes Plaintiff fiduciary duties, including the highest duties of good faith, due care, fair dealing and loyalty.

118.   Gene Phillips' participation in the related-party transactions described herein, which resulted in TCI's loss of cash and precarious economic health, constituted a breach of Gene Phillip's duties of good faith and fair dealing, due care, and loyalty.

119.   Gene Phillips "advice" to and "management" of TCI evidences his conflict of interest, self-dealing and bad faith by directing significant management and advisory fees to companies he owns and/or controls for, in effect, removing assets from TCI.

120.   Plaintiff has suffered economic damages as a proximate result of Phillips' breaches of fiduciary duties to Plaintiff.

121.   Accordingly, Plaintiff is entitled to monetary damages of at least $60 million, but in any event, an amount sufficient to fully compensate it for the harm it has sustained.

122.   The acts and conduct of Gene Phillips were intentional, willful, wanton, and malicious, and were without justification or excuse. Accordingly, Plaintiff is entitled to recover punitive damages from Phillips in an amount to be determined by the trier of fact.

**K.**   **Count Eleven:  Request for Injunctive Relief.**

123.   Plaintiff realleges and incorporates the allegations set forth above.

124.   If Defendants are permitted to continue to engage in related-party transactions similar to those alleged herein, Plaintiff will face a real and immediate threat of irreparable injury; namely, TCI will be completely looted and stripped of any and all assets.

125.   Therefore, Plaintiff seeks an injunction preventing TCI from entering into any related-party transactions unless:

a.   the common directorship, office or financial interest is known to the board of directors or committee approving or authorizing any contract or transaction and the approval or authorization is made in good faith by a vote sufficient for the purpose, without counting the vote or votes of the common or interested director(s); or

b.   the fact of the common directorship, office or financial interest is known to the stockholders, and they approve or authorize the contract or transaction in good faith by a majority vote of the stockholders holding a majority of the voting power; and

c.   the contract or transaction is fair to TCI at the time it is approved or authorized.

## VII.

## JURY DEMAND

126.   Plaintiff demands a jury on all issues so triable.

---

# VIII.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant all of the relief

requested herein, including:

1.    an injunction prohibiting TCI from entering any related-party transactions that are not fair to the corporation and approved by disinterested directors and/or the shareholders with full knowledge of the common interest of the directors, and/or officers;

2.    actual, consequential and punitive damages;

3.    attorneys' fees and costs; and

4.    any and all relief the Court deems necessary and just.

Dated: Dallas, Texas
      October 5, 2004

               Respectfully submitted,

               LACKEY HERSHMAN, L.L.P.

By:                           
               Deborah Deitsch-Perez
               State Bar No. 24036072
               3102 Oak Lawn Ave., Suite 777
               Dallas, Texas 75219
               Telephone:    (214) 560-2201
               Telecopier:    (214) 560-2203

               **ATTORNEYS FOR PLAINTIFF**
               **SUNSET MANAGEMENT, LLC**

---

## VERIFICATION

Sandy M. Marr, being duly sworn, deposes and says that he is an agent authorized to act on behalf of Sunset Management, LLC, Plaintiff in this action, that he has read the attached complaint herein and all the contents thereof are true and to his knowledge, except as to matters therein stated to be alleged on information and belief, and that, as to those matters, he believes them to be true.

_____
Sandy M. Marr

Subscribed and sworn to me this 4th day of _October_____, 2004.

VICKI L. HARLANDER-TAYLOR
Notary Public State of Nevada
No. 00-62355-1
My appt. exp. May 17, 2008

_____
Notary Public



TRIAD LTD
Highland Ltd
Regis I
Regis I Hotel

Property Management
Leasing & Brokerage
Mortgage Brokerage

BCM

100%

Realty Advisors

May Trust - Phillips Family

100%

ART

Public 22%

58%

100%

EQK HOLDINGS

TCIRACQ

100%

American Realty Investors [ARI]

12.60%

79%

Prime Asset Management
Advisory Fees
Management Fees

TCI - Public 20%

65%

6.60%

15%

21%

24%

IORI

Gene Phillips

100%

Syntek West

55.20%

```
<DOCUMENT>
<TYPE>EX-10.0
<SEQUENCE>3
<FILENAME>d09605exv10w0.txt
<DESCRIPTION>ADVISORY AGREEMENT
<TEXT>
<PAGE>
```

EXHIBIT 10.0

## ADVISORY AGREEMENT

### BETWEEN

### TRANSCONTINENTAL REALTY INVESTORS, INC.

### AND

### PRIME INCOME ASSET MANAGEMENT, LLC

THIS AGREEMENT dated as of October 1, 2003, between Transcontinental Realty Investors, Inc., a Nevada corporation (the "Company"), and Prime Income Asset Management, LLC (the "Advisor"), a Nevada limited liability company.

W I T N E S S E T H :

1.      The Company owns a complex, diversified portfolio of real estate, mortgages and other assets, including many non-performing or troubled assets.

2.      The Company is an active real estate investment company with funds available for investment primarily in the acquisition of income-producing real estate and to a lesser extent in short and medium term mortgages.

3.      The Advisor and its employees have extensive experience in the administration of real estate assets and the origination, structuring and evaluation of real estate and mortgage investments.

NOW THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties agree as follows:

1.      DUTIES OF THE ADVISOR. Subject to the supervision of the Board of Directors, the Advisor will be responsible for the day-to- day operations of the Company and, subject to Section 17 hereof, shall

1

```
<PAGE>
```

provide such services and activities relating to the assets, operations and business plan of the Company as may be appropriate, including:

        (a)     preparing and submitting an annual budget and business plan for approval by the Board of the Company (the "Business Plan");

        (b) using its best efforts to present to the Company a continuing and suitable investment program consistent with the investment policies and objectives of the Company as set forth in the Business Plan;

        (c)     using its best efforts to present to the Company



EXHIBIT

2

investment opportunities consistent with the Business Plan and such investment program as the Directors may adopt from time to time;

        (d)       furnishing or obtaining and supervising the performance of the ministerial functions in connection with the administration of the day-to-day operations of the Company including the investment of reserve funds and surplus cash in short-term money market investments;

        (e)       serving as the Company's investment and financial advisor and providing research, economic, and statistical data in connection with the Company's investments and investment and financial policies;

        (f)       on behalf of the Company, investigating, selecting and conducting relations with borrowers, lenders, mortgagors, brokers, investors, builders, developers and others; provided however, that the Advisor shall not retain on the Company's behalf any consultants or third party professionals, other than legal counsel, without prior Board approval;

        (g)       consulting with the Directors and furnishing the Directors with advice and recommendations with respect to the making,

2

<PAGE>

acquiring (by purchase, investment, exchange or otherwise), holding and disposition (through sale, exchange, or otherwise) of investments consistent with the Business Plan of the Company;

        (h)       obtaining for the Directors such services as may be required in acquiring and disposing of investments, disbursing and collecting the funds of the Company, paying the debts and fulfilling the obligations of the Company, and handling, prosecuting, and settling any claims of the Company, including foreclosing and otherwise enforcing mortgage and other liens securing investments;

        (i)       obtaining for and at the expense of the Company such services as may be required for property management, loan disbursements, and other activities relating to the investments of the Company, provided, however, the compensation for such services shall be agreed to by the Company and the service provider;

        (j)       advising the Company in connection with public or private sales of shares or other securities of the Company, or loans to the Company, but in no event in such a way that the Advisor could be deemed to be acting as a broker dealer or underwriter;

        (k)       quarterly and at any time requested by the Directors, making reports to the Directors regarding the Company's performance to date in relation to the Company's approved Business Plan and its various components, as well as the Advisor's performance of the foregoing services;

        (l)       making or providing appraisal reports, where appropriate, on investments or contemplated investments of the Company;

        (m)       assisting in preparation of reports and other documents necessary to satisfy the reporting and other requirements of any

3

<PAGE>

governmental bodies or agencies and to maintain effective communications with stockholders of the Company; and

(n)      doing all things necessary to ensure its ability to render the services contemplated herein, including providing office space and office furnishings and personnel necessary for the performance of the foregoing services as Advisor, all at its own expense, except as otherwise expressly provided for herein.

2.      NO PARTNERSHIP OR JOINT VENTURE. The Company and the Advisor are not partners or joint venturers with each other, and nothing herein shall be construed so as to make them such partners or joint venturers or impose any liability as such on either of them.

3.      RECORDS. At all times, the Advisor shall keep proper books of account and records of the Company's affairs which shall be accessible for inspection by the Company at any time during ordinary business hours.

4.      ADDITIONAL OBLIGATIONS OF THE ADVISOR. The Advisor shall refrain from any action that would (a) violate any law, rule, regulation, or statement of policy of any governmental body or agency having jurisdiction over the Company or over its securities, (b) cause the Company to be required to register as an investment company under the Investment Company Act of 1940, or (c) otherwise not be permitted by the Articles of Incorporation of the Company.

5.      BANK ACCOUNTS. The Advisor may establish and maintain one or more bank accounts in its own name, and may collect and deposit into any such account or accounts, and disburse from any such account or accounts, any money on behalf of the Company, under such terms and conditions as the Directors may approve, provided that no funds in any

4

<PAGE>

such account shall be commingled with funds of the Advisor; and the Advisor shall from time to time render appropriate accounting of such collections and payments to the Directors and to the auditors of the Company.

6.      BOND. The Advisor shall maintain a fidelity bond with a responsible surety company in such amount as may be required by the Directors from time to time, covering all directors, officers, employees, and agents of the Advisor handling funds of the Company and any investment documents or records pertaining to investments of the Company. Such bond shall inure to the benefit of the Company in respect to losses of any such property from acts of such directors, officers, employees, and agents through theft, embezzlement, fraud, negligence, error, or omission or otherwise, the premium for said bond to be at the expense of the Company.

7.      INFORMATION FURNISHED ADVISOR. The Directors shall have the right to change the Business Plan at any time, effective upon receipt by the Advisor of notice of such change. The Company shall furnish the Advisor with a certified copy of all financial statements, a signed copy of each report prepared by independent certified public accountants, and such other information with regard to the Company's affairs as the Advisor may from time to time reasonably request.

8.      CONSULTATION AND ADVICE. In addition to the services described

above, the Advisor shall consult with the Directors, and shall, at the request
of the Directors or the officers of the Company, furnish advice and
recommendations with respect to any aspect of the business and affairs of the
Company, including any factors that in the Advisor's best judgment should
influence the policies of the Company.

<div align="center">5</div>

<PAGE>

   9.  ANNUAL BUSINESS PLAN AND BUDGET. No later than January 15th of
each year, the Advisor shall submit to the Directors a written Business Plan for
the current Fiscal Year of the Company. Such Business Plan shall include a
twelve-month forecast of operations and cash flow with explicit assumptions and
a general plan for asset sales or acquisitions, lending, foreclosure and
borrowing activity, other investments or ventures and proposed securities
offerings or repurchases or any proposed restructuring of the Company. To the
extent possible, the Business Plan shall set forth the Advisor's recommendations
and the basis therefor with respect to all material investments of the Company.
Upon approval by the Board of Directors, the Advisor shall be authorized to
conduct the business of the Company in accordance with the explicit provisions
of the Business Plan, specifically including the borrowing, leasing,
maintenance, capital improvements, renovations and sale of investments set forth
in the Business Plan. Any transaction or investment not explicitly provided for
in the approved Business Plan shall require the prior approval of the Board of
Directors unless made pursuant to authority expressly delegated to the Advisor.
Within sixty (60) days of the end of each calendar quarter, the Advisor shall
provide the Board of Directors with a report comparing the Company's actual
performance for such quarter against the Business Plan.

   10.  DEFINITIONS. As used herein, the following terms shall have
the meanings set forth below:

     (a)  "Affiliate" shall mean, as to any Person, any other
Person who owns beneficially, directly, or indirectly, 1% or more of the
outstanding capital stock, shares or equity interests of such

<div align="center">6</div>

<PAGE>

Person or of any other Person which controls, is controlled by, or is under
common control with such Person or is an officer, retired officer, director,
employee, partner, or trustee (excluding noninterested trustees not otherwise
affiliated with the entity) of such Person or of any other Person which
controls, is controlled by, or is under common control with, such Person.

     (b) "Appraised Value" shall mean the value of a Real Property
according to an appraisal made by an independent qualified appraiser who is a
member in good standing of the American Institute of Real Estate Appraisers and
is duly licensed to perform such services in accordance with the applicable
state law, or, when pertaining to Mortgage Loans, the value of the underlying
property as determined by the Advisor.

     (c) "Book Value" of an asset or assets shall mean the value of
such asset or assets on the books of the Company, before provision for
amortization, depreciation, depletion or valuation reserves and before deducting
any indebtedness or other liability in respect thereof, except that no asset
shall be valued at more than its fair market value as determined by the
Directors.

      (d) "Book Value of Invested Assets" shall mean the Book Value of the Company's total assets (without deduction of any liabilities), but excluding (i) goodwill and other intangible assets, (ii) cash, and (iii) cash equivalent investments with terms which mature in one year or less.

      (e) "Business Plan" shall mean the Company's investment policies and objectives and the capital and operating budget based thereon, approved by the Board as thereafter modified or amended.

<div align="center">7</div>

&lt;PAGE&gt;

      (f) "Fiscal Year" shall mean any period for which an income tax return is submitted to the Internal Revenue Service and which is treated by the Internal Revenue Service as a reporting period.

      (g) "Gross Asset Value" shall mean the total assets of the Company after deduction of allowance for amortization, depreciation or depletion and valuation reserves.

      (h) "Mortgage Loans" shall mean notes, debentures, bonds, and other evidences of indebtedness or obligations, whether negotiable or non-negotiable, and which are secured or collateralized by mortgages, including first, wraparound, construction and development, and junior mortgages.

      (i) "Net Asset Value" shall mean the Book Value of all the assets of the Company minus all the liabilities of the Company.

      (j) "Net Income" for any period shall mean the Net Income of the Company for such period computed in accordance with generally accepted accounting principles after deduction of the Gross Asset Fee, but before deduction of the Net Income Fee, as set forth in Sections 11(a) and 11(b), respectively, herein, and inclusive of gain or loss of the sale of assets.

      (k) "Net Operating Income" shall mean rental income less property operating expenses.

      (l) "Operating Expenses" shall mean the aggregate annual expenses regarded as operating expenses in accordance with generally accepted accounting principles as determined by the independent auditors selected by the Directors and including the Gross Asset Fee payable to the Advisor and fees and expenses

<div align="center">8</div>

&lt;PAGE&gt;
paid to the Directors who are not employees or Affiliates of the Advisor.

      (m) The operating expenses shall exclude, however, the following:

         (i)      the cost of money borrowed by the Company;

         (ii)     income taxes, taxes and assessments on real property and all other taxes applicable to the Company;

         (iii)    expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and stock exchange listing of the Company's securities (including legal, auditing, accounting, underwriting, brokerage,

printing, engraving and other fees);

        (iv)     fees and expenses paid to independent mortgage servicers, contractors, consultants, managers and other agents retained by or on behalf of the Company;

        (v)     expenses directly connected with the purchase, origination, ownership and disposition of Real Properties or Mortgage Loans (including the costs of foreclosure, insurance, legal, protective, brokerage, maintenance, repair and property improvement services) other than expenses with respect thereto of employees of the Advisor, except legal, internal auditing, foreclosure and transfer agent services performed by employees of the Advisor;

        (vi)     expenses of maintaining and managing real estate equity interests and processing and servicing mortgage and other loans;

<div align="center">9</div>

&lt;PAGE&gt;

        (vii)     expenses connected with payments of dividends, interest or distributions by the Company to shareholders;

        (viii)     expenses connected with communications to shareholders and bookkeeping and clerical expenses for maintaining shareholder relations, including the cost of printing and mailing share certificates, proxy solicitation materials and reports;

        (ix)     transfer agent's, registrar's and indenture trustee's fees and charges; and

        (x)     the cost of any accounting, statistical, bookkeeping or computer equipment necessary for the maintenance of books and records of the Company. Additionally, the following expenses of the Advisor shall be excluded:

        (i)     employment expenses of the Advisor's personnel (including Directors, officers and employees of the Company who are directors, officers or employees of the Advisor or its Affiliates), other than the expenses of those employee services listed at (v) above.

        (ii)     rent, telephone, utilities and office furnishings and other office expenses of the Advisor (except those relating to a separate office, if any, maintained by the Company); and

        (iii)     the Advisor's overhead directly related to performance of its functions under this Agreement.

    (n) "Person" shall mean and include individuals, corporations, limited partnerships, general partnerships, joint

<div align="center">10</div>

&lt;PAGE&gt;

stock companies or associations, joint ventures, associations,
companies, trusts, banks, trust companies, land trusts, business
trusts, or other entities and governments and agencies and political
subdivisions thereof.

(o) "Real Property" shall mean and include land, rights in
land, leasehold interests (including but not limited to interests of a
lessor or lessee therein), and any buildings, structures, improvements,
fixtures, and equipment located on or used in connection with land,
leasehold interests, and rights in land or interests therein.

All calculations made pursuant to this Agreement shall be based on
statements (which may be unaudited, except as provided herein) prepared on an
accrual basis consistent with generally accepted accounting principles,
regardless of whether the Company may also prepare statements on a different
basis. All other terms shall have the same meaning as set forth in the Company's
Articles of Incorporation and Bylaws.

11.     ADVISORY COMPENSATION.

(a)     Gross Asset Fee. On or before the twenty-eighth day
of each month during the term hereof, the Company shall pay to the
Advisor, as compensation for the basic management and advisory services
rendered to the Company hereunder, a fee at the rate of .0625% per
month of the average of the Gross Asset Value of the Company at the
beginning and at the end of the next preceding calendar month. Without
negating the provisions of Sections 18, 19, 22 and 23 hereof, the
annual rate of the Gross Asset Fee shall be .75% per annum.

11

<PAGE>

(b)     Net Income Fee. As an incentive for successful
investment and management of the Company's assets, the Advisor will be
entitled to receive a fee equal to 7.5% per annum of the Company's Net
Income for each Fiscal Year or portion thereof for which the Advisor
provides services. To the extent the Company has Net Income in a
quarter, the 7.5% Net Income fee is to be paid quarterly on or after
the third business day following the filing of the report on Form 10-Q
with the Securities and Exchange Commission, except for the payment for
the fourth quarter, ended December 31, which is to be paid on or after
the third business day following the filing of the report on Form 10-K
with the Securities and Exchange Commission.

The 7.5% Net Income Fee is to be cumulative within any Fiscal
Year, such that if the Company has a loss in any quarter during the
Fiscal Year, each subsequent quarter's payment during such Fiscal Year
shall be adjusted to maintain the 7.5% per annum rate, with final
settlement being made with the fourth quarter payment and in accordance
with audited results for the Fiscal Year. The 7.5% Net Income Fee is
not cumulative from year to year.

(c)     Acquisition Commission. For supervising the
acquisition, purchase or long term lease of Real Property for the
Company, the Advisor is to receive an Acquisition Commission equal to
the lesser of (i) up to 1% of the cost of acquisition, inclusive of
commissions, if any, paid to nonaffiliated brokers; or (ii) the
compensation customarily charged in arm's-length transactions by others
rendering similar property acquisition

12

<PAGE>

services as an ongoing public activity in the same geographical
location and for comparable property. The aggregate of each purchase
price of each property (including the Acquisition Commissions and all
real estate brokerage fees) may not exceed such property's Appraised
Value at acquisition.

(d)     Incentive Sales Compensation. To encourage periodic
sales of appreciated Real Property at optimum value and to reward the
Advisor for improved performance of the Company's Real Property, the
Company shall pay to the Advisor, on or before the 45th day after the
close of each Fiscal Year, an incentive fee equal to 10% of the amount,
if any, by which the aggregate sales consideration for all Real
Property sold by the Company during such Fiscal Year exceeds the sum
of: (i) the cost of each such Real Property as originally recorded in
the Company's books for tax purposes (without deduction for
depreciation, amortization or reserve for losses), (ii) capital
improvements made to such assets during the period owned by the
Company, and (iii) all closing costs, (including real estate
commissions) incurred in the sale of such Real Property; provided
however, no incentive fee shall be paid unless (a) such Real Property
sold in such Fiscal Year, in the aggregate, has produced an 8% simple
annual return on the Company's net investment, including capital
improvements, calculated over the Company's holding period before
depreciation and inclusive of operating income and sales consideration
and (b) the aggregate Net Operating Income from all Real Property owned
by the Company for all of the prior Fiscal Year and the current Fiscal

13

<PAGE>

Year shall be at least 5% higher in the current Fiscal Year than in the
prior Fiscal Year.

(e)     Mortgage or Loan Acquisition Fees. For the
acquisition or purchase from an unaffiliated party of any existing
mortgage or loan by the Company, the Advisor or an Affiliate is to
receive a Mortgage or Loan Acquisition Fee equal to the lesser of (a)
1% of the amount of the mortgage or loan purchased by the Company or
(b) a brokerage or commitment fee which is reasonable and fair under
the circumstances. Such fee will not be paid in connection with the
origination or funding by the Company of any mortgage loan.

(f)     Mortgage Brokerage and Equity Refinancing Fees. For
obtaining loans to the Company or refinancing on Company properties,
the Advisor or an Affiliate is to receive a Mortgage Brokerage and
Equity Refinancing Fee equal to the lesser of (a) 1% of the amount of
the loan or the amount refinanced or (b) a brokerage or refinancing fee
which is reasonable and fair under the circumstances; provided, however
that no such fee shall be paid on loans from the Advisor or an
Affiliate without the approval of the Board of Directors. No fee shall
be paid on loan extensions.

12.     LIMITATION ON THIRD PARTY MORTGAGE PLACEMENT FEES. The
Advisor or any of its Affiliates shall pay to the Company, one-half of any
compensation received by the Advisor or any such Affiliate from third parties
with respect to the origination, placement or brokerage of any loan made by the
Company, provided, however, the compensation retained by the Advisor or
Affiliate shall not exceed the lesser of (a)

14

<PAGE>

2% of the amount of the loan committed by the Company or (b) a loan brokerage and commitment fee which is reasonable and fair under the circumstances.

13.        STATEMENTS. The Advisor shall furnish to the Company not later than the tenth day of each calendar month, beginning with the second calendar month of the term of this Agreement, a statement showing the computation of the fees, if any, payable in respect to the next preceding calendar month (or, in the case of incentive compensation, for the preceding Fiscal Year, as appropriate) under the Agreement. The final settlement of incentive compensation for each Fiscal Year shall be subject to adjustment in accordance with, and upon completion of, the annual audit of the Company's financial statements; any payment by the Company or repayment by the Advisor that shall be indicated to be necessary in accordance therewith shall be made promptly after the completion of such audit and shall be reflected in the audited statements to be published by the Company.

14.        COMPENSATION FOR ADDITIONAL SERVICES. If and to the extent that the Company shall request the Advisor or any director, officer, partner, or employee of the Advisor to render services for the Company other than those required to be rendered by the Advisor hereunder, such additional services, if performed, will be compensated separately on terms to be agreed upon between such party and the Company from time to time. In particular, but without limitation, if the Company shall request that the Advisor perform property management, leasing, loan disbursement or similar functions, the Company and the Advisor shall enter into a separate agreement specifying the obligations of the

15

<PAGE>

parties and providing for reasonable additional compensation to the Advisor for performing such services.

15.        EXPENSES OF THE ADVISOR. Without regard to the amount of compensation or reimbursement received hereunder by the Advisor, the Advisor shall bear the following expenses:

                (a)        employment expenses of the personnel employed by the Advisor (including Directors, officers, and employees of the Company who are directors, officers, or employees of the Advisor or of any company that controls, is controlled by, or is under common control with the Advisor), including, but not limited to, fees, salaries, wages, payroll taxes, travel expenses, and the cost of employee benefit plans and temporary help expenses except for those personnel expenses described in Sections 16(e) and (p);

                (b)        advertising and promotional expenses incurred in seeking investments for the Company;

                (c)        rent, telephone, utilities, office furniture and furnishings, and other office expenses of the Advisor and the Company, except as any of such expenses relates to an office maintained by the Company separate from the office of the Advisor; and

                (d)        miscellaneous administrative expenses relating to performance by the Advisor of its functions

hereunder.

16. EXPENSES OF THE COMPANY. The Company shall pay all of its expenses not assumed by the Advisor and, without limiting the generality of the foregoing, it is specifically agreed that the

16

<PAGE>

following expenses of the Company shall be paid by the Company and shall not be paid by the Advisor:

(a)      the cost of money borrowed by the Company;

(b)      income taxes, taxes and assessments on real property, and all other taxes applicable to the Company;

(c)      legal, auditing, accounting, underwriting, brokerage, listing, registration and other fees, printing, and engraving and other expenses, and taxes incurred in connection with the issuance, distribution, transfer, registration, and stock exchange listing of the Company's securities:

(d)      fees, salaries, and expenses paid to officers, and employees of the Company who are not directors, officers or employees of the Advisor, or of any company that controls, is controlled by, or is under common control with the Advisor;

(e)      expenses directly connected with the origination or purchase of Mortgage Loans and with the acquisition, disposition and ownership of real estate equity interests or other property (including the costs of foreclosure, insurance, legal, protective, brokerage, maintenance, repair, and property improvement services) and including all compensation, traveling expenses, and other direct costs associated with the Advisor's employees or other personnel engaged in (i) real estate transaction legal services, (ii) internal auditing, (iii) foreclosure and other mortgage finance services, (iv) sale or solicitation for sale of mortgages, (v) engineering and appraisal services, and (vi) transfer agent services.

17

<PAGE>

(f)      expenses of maintaining and managing real estate equity interests;

(g)      insurance, as required by the Directors (including Directors' liability insurance);

(h)      the expenses of organizing, revising, amending, converting, modifying, or terminating the Company;

(i)      expenses connected with payments of dividends or interest or distributions in cash or any other form made or caused to be made by the Directors to holders of securities of the Company;

(j)      all expenses connected with communications to holders of securities of the Company and the other bookkeeping and clerical work necessary in maintaining relations with holders of securities,

including the cost of printing and mailing certificates for securities and proxy solicitation materials and reports to holders of the Company's securities;

   (k)      the cost of any accounting, statistical, bookkeeping or computer equipment or computer time necessary for maintaining the books and records of the Company and for preparing and filing Federal, State and Local tax returns;

   (l)      transfer agent's, registrar's, and indenture trustee's fees and charges;

   (m)      legal, accounting, investment banking, and auditing fees and expenses charged by independent parties performing these services not otherwise included in clauses (c) and (e) of this Section 16;

18

<PAGE>

   (n)      expenses incurred by the Advisor, arising from the sales of Company properties, including those expenses related to carrying out foreclosure proceedings;

   (o)      commercially reasonable fees paid to the Advisor for efforts to liquidate mortgages before maturity, such as the solicitation of offers and negotiation of terms of sale;

   (p)      costs and expenses connected with computer services, including but not limited to employee or other personnel compensation, hardware and software costs, and related development and installation costs associated therewith;

   (q)      costs and expenses associated with risk management (i.e. insurance relating to the Company's assets);

   (r)      loan refinancing compensation; and

   (s)      expenses associated with special services requested by the Directors pursuant to Section 14 hereof.

   17.      OTHER ACTIVITIES OF ADVISOR. The Advisor, its officers, directors, or employees or any of its Affiliates may engage in other business activities related to real estate investments or act as advisor to any other person or entity (including another real estate investment trust), including those with investment policies similar to the Company, and the Advisor and its officers, directors, or employees and any of its Affiliates shall be free from any obligation to present to the Company any particular investment opportunity that comes to the Advisor or such persons, regardless of whether such opportunity is in accordance with the Company's Business Plan. However, to minimize any possible conflict, the Advisor shall consider the respective investment objectives of, and the appropriateness of a particular investment to

19

<PAGE>

each such entity in determining to which entity a particular investment opportunity should be presented. If appropriate to more than one entity, the

Advisor shall present the investment opportunity to the entity that has had sufficient uninvested funds for the longest period of time.

18.      LIMITATION ON OPERATING EXPENSES. To the extent that the Operating Expenses of the Company for any Fiscal Year exceed the lesser of (a) 1.5% of the average of the Book Values of Invested Assets of the Company at the end of each calendar month of such Fiscal Year, or (b) the greater of 1.5% of the average of the Net Asset Value of the Company at the end of each calendar month of such Fiscal Year or 25% of the Company's Net Income, the Advisor shall refund to the Company from the fees paid to the Advisor the amount, if any, by which the Operating Expenses so exceed the applicable amount, provided, however, that the Advisor shall not be required to refund to the Company, with respect to any Fiscal Year, any amount which exceeds the aggregate of the Gross Asset Fees paid to the Advisor under this Agreement with respect to such Fiscal Year.

19.      TERM; TERMINATION OF AGREEMENT. This Agreement shall continue in force until the next Annual Meeting of Stockholders of the Company, and, thereafter, it may be renewed from year to year, subject to any required approval of the Stockholders of the Company and, if any Director is an Affiliate of the Advisor, the approval of a majority of the Directors who are not so affiliated. Notice of renewal shall be given in writing by the Directors to the Advisor not less than 60 days before the expiration of this Agreement or of any extension thereof. This Agreement may be terminated for any reason without penalty upon 60

<div align="center">20</div>

&lt;PAGE&gt;

days' written notice by the Company to the Advisor or 120 days' written notice by the Advisor to the Company, in the former case by the vote of a majority of the Directors who are not Affiliates of the Advisor or by the vote of holders of a majority of the outstanding shares of the Company. Notwithstanding the foregoing, however, in the event of any material change in the ownership, control or management of the Advisor, the Company may terminate this Agreement without penalty and without advance notice to the Advisor.

20.      AMENDMENTS. This Agreement shall not be changed, modified, terminated or discharged in whole or in part except by an instrument in writing signed by both parties hereto, or their respective successors or assigns, or otherwise as provided herein.

21.      ASSIGNMENT. This Agreement shall not be assigned by the Advisor without the prior consent of the Company. The Company may terminate this Agreement in the event of its assignment by the Advisor without the prior consent of the Company. Such an assignment or any other assignment of this Agreement shall bind the assignee hereunder in the same manner as the Advisor is bound hereunder. This Agreement shall not be assignable by the Company without the consent of the Advisor, except in the case of assignment by the Company to a corporation, association, trust, or other organization that is a successor to the Company. Such successor shall be bound hereunder and by the terms of said assignment in the same manner as the Company is bound hereunder.

22.      DEFAULT, BANKRUPTCY, ETC. At the option solely of the Directors, this Agreement shall be and become terminated immediately upon written notice of termination from the Directors to the Advisor if any of the following events shall occur:

<div align="center">21</div>

<PAGE>

        (a)      If the Advisor shall violate any provision of this Agreement, and after notice of such violation shall not cure such default within 30 days; or

        (b)      If the Advisor shall be adjudged bankrupt or insolvent by a court of competent jurisdiction, or an order shall be made by a court of competent jurisdiction for the appointment of a receiver, liquidator, or trustee of the Advisor or of all or substantially all of its property by reason of the foregoing, or approving any petition filed against the Advisor for its reorganization, and such adjudication or order shall remain in force or unstayed for a period of 30 days; or

        (c)      If the Advisor shall institute proceedings for voluntary bankruptcy or shall file a petition seeking reorganization under the Federal bankruptcy laws, or for relief under any law for the relief of debtors, or shall consent to the appointment of a receiver of itself or of all or substantially all its property, or shall make a general assignment for the benefit of its creditors, or shall admit in writing its inability to pay its debts generally, as they become due.

        The Advisor agrees that if any of the events specified in subsections (b) and (c) of this Section 22 shall occur, it will give written notice thereof to the Directors within seven days after the occurrence of such event.

        23.      ACTION UPON TERMINATION. From and after the effective date of termination of this Agreement, pursuant to Sections 19, 21 or 22 hereof, the Advisor shall not be entitled to compensation for further

<div align="center">22</div>

<PAGE>

services hereunder but shall be paid all compensation accruing to the date of termination. The Advisor shall forthwith upon such termination:

        (a)      pay over to the Company all monies collected and held for the account of the Company pursuant to this Agreement;

        (b)      deliver to the Directors a full accounting, including a statement showing all payments collected by it and a statement of any monies held by it, covering the period following the date of the last accounting furnished to the Directors; and

        (c)      deliver to the Directors all property and documents of the Company then in the custody of the Advisor.

        24.      MISCELLANEOUS. The Advisor shall be deemed to be in a fiduciary relationship to the stockholders of the Company. The Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder in good faith, and shall not be responsible for any action of the Directors in following or declining to follow any advice or recommendations of the Advisor. Neither the Advisor nor any of its shareholders, directors, officers, or employees shall be liable to the Company, the Directors, the holders of securities of the Company or to any successor or assign of the Company for any losses arising from the operation of the Company if the Advisor had determined, in good faith, that the course of conduct which caused the loss or liability was in the best interests of the Company and the liability or loss

was not the result of negligence or misconduct by the Advisor. However, in no event will the directors, officers or employees of the Advisor be personally liable for any act or failure to act unless it was the result of such person's willful misfeasance, bad faith, gross negligence or reckless disregard of duty.

<center>23</center>

<PAGE>

     25.     NOTICES. Any notice, report, or other communication required or permitted to be given hereunder shall be in writing unless some other method of giving such notice, report, or other communication is accepted by the party to whom it is given, and shall be given by being delivered at the following addresses of the parties hereto:

     The Directors and/or the Company:

          Transcontinental Realty Investors, Inc.
          1800 Valley View Lane
          Suite 300
          Dallas, Texas 75234
          Attention: President

     The Advisor:

          Prime Income Asset Management, LLC
          1800 Valley View Lane
          Suite 300
          Dallas, Texas 75234
          Attention: Executive Vice President and Chief Financial
                Officer

     Either party may at any time give notice in writing to the other party of a change of its address for the purpose of this Section 25.

     26.     HEADINGS. The section headings hereof have been inserted for convenience of reference only and shall not be construed to affect the meaning, construction, or effect of this Agreement.

     27.     GOVERNING LAW. This Agreement has been prepared, negotiated and executed in the State of Texas. The provisions of this Agreement shall be construed and interpreted in accordance with the laws of the State of Texas applicable to agreements made and to be performed entirely in the State of Texas.

<center>24</center>

<PAGE>

     28.     EXECUTION. This instrument is executed and made on behalf of the Company by an officer of the Company, not individually but solely as an Officer, and the obligations under this Agreement are not binding upon, nor shall resort be had to the private property of, any of the Directors, stockholders, officers, employees, or agents of the Company personally, but bind only the Company property.

<center>25</center>

<PAGE>

    IN WITNESS WHEREOF, TRANSCONTINENTAL REALTY INVESTORS, INC. and PRIME
INCOME ASSET MANAGEMENT, LLC, by their duly authorized officers, have signed
these presents all as of the day and year first above written.

                              TRANSCONTINENTAL REALTY
                              INVESTORS, INC.

                              By: /s/ Ronald E. Kimbrough
                                 --------------------------------
                                 Ronald E. Kimbrough
                                 Executive Vice President

                              PRIME INCOME ASSET MANAGEMENT, LLC

                              By: /s/ Mark W. Branigan
                                 --------------------------------
                                 Mark W. Branigan
                                 Executive Vice President

                         26

&lt;/TEXT&gt;
&lt;/DOCUMENT&gt;